IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

STEVEN LEON BAKER                                                    PLAINTIFF

V.                                      NO. 15-5270

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Steven Leon Baker, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act ("Act"). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff filed his applications for DIB and SSI on February 20, 2013, alleging disability beginning January 15, 2008, due to heart problems, high blood pressure, bipolar disorder, and shoulder problems (ECF No. 11 pp. 250). An administrative hearing was held on April 2, 2014, where the claimant appeared with his attorney by video teleconference. (ECF No. 11, pp. 35-80).

By written decision dated July 10, 2014, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe – chronic

1

ischemic heart disease, obesity, and mood disorder. (ECF No. 11, p. 18). After reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (ECF No. 11, pp. 19-21). The ALJ determined Plaintiff retained the residual functional capacity ("RFC") to:

> perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except with the following limitations: handle and finger frequently bilaterally; frequently reach, including overhead, with the right upper extremity; limited to interpersonal contact that is incidental to the work performed where the complexity of tasks is learned and performed by rote with little if any judgment, and supervision required is simple, direct, and concrete.

(ECF No. 11, pp. 21-26). With the help of the vocational expert ("VE"), the ALJ determined that during the relevant time period, Plaintiff would be able to perform his past relevant work as a cashier II and car wash attendant. (ECF No.11, pp. 26-28).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied his request on September 25, 2015. (ECF No. 11, p. 5). Subsequently, Plaintiff filed this action. (ECF No. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (ECF Nos. 9, 10).

**II.    Evidence Presented:**

Plaintiff presented to the Northwest Medical Center in Benton County on August 28, 2008, and complained of chest pain while reportedly lifting heavy paint buckets. (ECF No. 11, pp. 335-37, 472-94). He also stated he sometimes stayed with his brother and was in the process of building a house. Id. He was admitted for care until September 3, 2008. Id. Plaintiff's cardiac enzymes were negative and an EKG showed only sinus tachycardia with a possible depression in V6 with a bundle branch block. Id. The catheterization lab discovered severe two-vessel coronary disease, high grade RV marginal disease, and hypokinesis in the anterior segment.

2

Plaintiff underwent a triple bypass grafting procedure. Id. On discharge, Plaintiff was diagnosed with unstable angina, coronary atherosclerosis, two-vessel coronary artery disease with slightly reduced left ventricular function, essential hypertension, and alcohol withdrawal. Id. Plaintiff followed up with Dr. Russell Davis on September 24, 2008, who opined Plaintiff was "doing extremely well." (ECF No. 11, pp. 338).

Approximately two months after Plaintiff's bypass procedure, on November 3, 2008, he presented to Mercy Hospital Northwest and complained of shortness of breath and chest pain. (ECF No. 11, pp. 370-77, 499-573). Plaintiff reported he had been doing well and walking a mile and getting more active until the previous day. Id. He was admitted for observation and testing until November 4, 2008. Id. A CT pulmonary angiogram was negative. Id. A chest x-ray showed postoperative changes in median sternotomy, clear lungs, and mild cardiomegaly. Id. A CT of Plaintiff's chest without contrast was negative with no filling defect, clear lungs, and no adenopathy or pleural fluid. Id. Plaintiff underwent cardiac catheterization and a left and right coronary arteriogram which showed an anomalous left main coronary artery and a normal right coronary artery. Id. Plaintiff's echocardiogram showed normal left ventricular systolic function with an estimated ejection fraction of sixty-five percent (65%). Id. Plaintiff was diagnosed with unstable angina and chest pain. Id. He was prescribed Nitroglycerin and Amlodipine and Dr. James Slezak limited Plaintiff's activity level to lifting no greater than twenty (20) pounds.

Plaintiff followed up with Dr. David Beeman on November 19, 2008, but had no new complaints and reported he felt like he was doing fine. (ECF No. 11, pp. 343-45). Dr. Beeman's objective examination was normal and he diagnosed Plaintiff with gastroesophageal reflux disease ("GERD"), hyperlipidemia, hypertension, and coronary artery disease. Id. Plaintiff was

3

prescribed Lisinopril, Metoprolol Tartrate, Amlodipine, Isosorbide Mononitrate, and Simvastatin. Id.

Plaintiff returned to Mercy Hospital Northwest on February 12, 2009, and complained of chest pain while chopping wood. (ECF No. 11, pp. 574-640). Plaintiff's mother called the emergency room and told them Plaintiff was an alcoholic, that he had been drinking for the past two days, and that she didn't believe Plaintiff was taking his medication. Id. A chest x-ray showed a postoperative chest with mild cardiomegaly. Id. Heart catheterization was advised but Plaintiff refused and wanted to be discharged. Id. The cardiology department advised to continue current treatment with medications until Plaintiff was free of chest pain and then to discharge him. Id. Plaintiff was diagnosed with chest pain, coronary artery disease, hypertension, hyperlipidemia, GERD, and alcohol use. Id. He was prescribed Pantoprazole and was discharged the following day, on February 13, 2009. Id.

On September 19, 2009, Plaintiff visited Mercy Hospital Northwest and complained of right leg and foot pain. (ECF No. 11, pp. 641-59). He was diagnosed with gout and prescribed Colchicine, Ibuprofen, and Oxycodone-Acetaminophen. Id.

Plaintiff visited Dr. David Ewart on September 28, 2009, and complained of chest pain and presented with alcohol withdrawal symptoms. (ECF No. 11, pp. 442-48). Dr. Ewart noted Plaintiff had chest pain, a history of coronary artery disease, and alcohol withdrawal. Id.  A stress test showed anterior hypokinesis with infarction with peri-infarct ischemia. Id. Plaintiff underwent left heart catheterization, a left ventriculogram, selective arteriography, right femoral angiography, saphenous vein angiography, and LIMA angiography. Id. The findings showed two-vessel coronary artery disease, wall motion abnormalities, preserved overall ejection fraction, patent left internal mammary artery to left anterior descending, patent

saphenous vein graft to the right ventricular marginal, and sixty to seventy percent (60% - 70%) stenosis in the right coronary artery distal to the right ventricular marginal. Id. Dr. Ewart elected to treat Plaintiff with medical therapy including Plavix, a beta blocker, and Aspirin. Id.

Plaintiff visited Dr. Latifat Ogon at the Community Clinic of St. Francis House on December 11, 2009, to establish care for his gout and blood pressure. (ECF No. 11, pp. 991-92). He denied any complaint at the time of the visit. Id. Plaintiff was diagnosed with hypertension, coronary atherosclerosis of native vessel, gout, and long term use of medications. Id. Plaintiff was given Clonidine in the office but was not otherwise prescribed any new medications. Id. Plaintiff followed up with Dr. Ogon on December 30, 2009, but the record does not indicate any new complaints or treatment on that date. (ECF No. 11, pp. 988-90). Plaintiff followed up again with Dr. Ogon on January 12, 2010, to review lab work and complained of right side chest pain. (ECF No. 11, pp. 986-87). Plaintiff was diagnosed with hypertension, coronary atherosclerosis, hyperlipidemia, gouty arthropathy, and GERD. Id. Dr. Ogon increased the dosage of Plaintiff's Pravastatin but did not otherwise provide further treatment. Id. Plaintiff followed up with Northwest Arkansas Heart and Vascular on February 11, 2010. (ECF No. 11, pp. 466-69). It was noted during Plaintiff's objective medical examination that his attention, concentration, and mood and affect were all normal. Id. Plaintiff was diagnosed with coronary artery disease, chest discomfort, and hypertension, but the record does not indicate Plaintiff received any new medications. Id.

Dr. Amr El-Shafei performed a left heart catheterization on February 18, 2010, with a left ventriculogram, selective coronary arteography, right femoral angiography, saphenous vein graft angiography, and left internal mammary artery angiography. (ECF No. 11, pp. 470-71). The procedure revealed coronary artery disease, wall motion abnormalities, preserved

ejection fraction, and normal renal arteries. Id. Dr. El-Shafei noted that, in October of 2008, the choice was made to treat Plaintiff with medical therapy because he had previously been non-compliant with taking his medication, Plavix, and Dr. El-Shafei elected to continue medical therapy based on his findings. Id.

Plaintiff presented to Mercy Hospital Northwest on March 20, 2010, and complained of chest pain. (ECF No. 11, pp. 660-718). One examiner who recorded Plaintiff's history of his present illness remarked, "[he] says earlier today he tried drinking a pint of vodka to help calm the pain, which was apparently ineffective." Id. at 666. A chest x-ray showed a postoperative chest with no acute cardiopulmonary process. Id. Plaintiff was treated with medications and discharged on March 22, 2010. Id.

Plaintiff again visited Northwest Medical Center in Bentonville on April 14, 2010, with complaints of chest pain. (ECF No. 11, pp. 455-65). Cardiac enzymes were negative, cardiac studies were unremarkable, and Plaintiff was treated with intravenous and oral medications. Id. He was diagnosed with unstable angina, chronic alcoholism, hypertension, hyperlipidemia, and chronic pain syndrome. Id. Plaintiff followed up with Dr. Ogon on April 19, 2010, to recheck his blood pressure. (ECF No. 11, pp. 982-85). He was diagnosed with hypertension, hyperlipidemia, coronary atherosclerosis, and GERD, and was given no new prescriptions. Id.

On September 4, 2010, Plaintiff presented to Mercy Hospital Northwest and complained of chest pain after having drank a pint of vodka. (ECF No. 11, pp. 750-86). He reported jogging earlier in the morning with no chest pain but had been out of his medications for a week. Id. A chest x-ray showed cardiomegaly and no acute cardiopulmonary process. Id. A portable upright chest x-ray showed median sternotomy wires, an enlarged cardiac silhouette, no focal consolidation, effusion, or pneumothorax, and pulmonary vasculature was

within normal limits and a deformity of the distal left clavicle was unchanged. Id. Plaintiff was diagnosed with alcohol abuse, gastritis, and drug noncompliance, but no new prescriptions were reported in the record. Id.

On January 22, 2011, Plaintiff presented to Mercy Hospital Northwest and complained of chest pain and suicidal ideation. (ECF No. 11, pp. 787-849). Plaintiff was positive for agitation and feelings of worthlessness. Id. He was negative for anhedonia, insomnia, hypersomnia, appetite change, unexpected weight change, psychomotor retardation, attention impairment, euphoric mood, increased goal-directed activity, flight of ideas, inflated self-esteem, decreased need for sleep, distractibility, poor judgment, visual change, headaches, abdominal pain, and seizures. Id. The record indicated Plaintiff had hypertension with his anxiety but that is was relieved with medication. Id. Plaintiff objected to being admitted to the hospital for his chest pain and his family reportedly advised the hospital that Plaintiff would likely leave against medical advice if he were admitted. Id. The notes of a registered nurse who examined the Plaintiff indicated:

> His affect is not angry, not blunt, not labile and not inappropriate. His speech is not delayed, not tangential and not slurred. He is slowed. He is not agitated, not aggressive, is not hyperactive, not withdrawn, not actively hallucinating and not combative. Thought content is not paranoid and not delusional. Cognition and memory are not impaired. He does not express impulsivity or inappropriate judgment. He exhibits a depressed mood. . . . He is communicative. He exhibits normal recent memory and normal remote memory. He is attentive.

Id. at 819. A chest x-ray showed mild cardiomegaly and no acute cardiopulmonary process. Id. Plaintiff was diagnosed with suicidal ideation and alcohol abuse and was transferred to Springwoods Behavioral Health on January 23, 2011. Id.

Plaintiff's diagnosis at the time of transfer to Springwoods Behavioral Health was depression with suicidal ideation and alcohol dependence. (ECF No. 11, pp. 391-403). He

reported high irritability and that he isolated himself from others but he denied suffering general social anxiety. Id. Betty King, a nurse practitioner, made the following diagnosis, approved by Dr. Donnie Holden:

| | | |
|---|---|---|
| Axis I: | depression disorder, NOS; post-traumatic stress disorder; alcohol dependence/withdrawal | |
| Axis II: | no diagnosis | |
| Axis III: | hypertension; poor circulation to arms; GERD; gout; hypercholesterolemia; coronary artery disease with coronary artery bypass graft with two stents; chronic back, neck, and shoulder pain | |
| Axis IV: | psychosocial stressors are relational, familial, occupational, and limited support | |
| Axis V: | GAF 30 upon admission | |

Id. Plaintiff's condition improved with medication and stabilized. Id. Plaintiff was assessed with a GAF score of 40 at the time of discharge. Id. Plaintiff's prognosis was good but the healthcare provider noted that it was dependent on Plaintiff's compliance with medications, discharge planning, and abstinence from mood-altering substances such as alcohol. Id. He was discharged on February 7, 2011. Id.

Plaintiff met with Lindsey Myers, a Licensed Clinical Social Worker, at Ozark Guidance, on February 14, 2011, one week after his discharge from Springwoods Behavioral Health. (ECF No. 11, pp. 384-89). He reported alcoholism, suicidal tendencies, and depression. Id. He also reported not having relationships anymore but tolerated his family and enjoyed spending time with his nieces and nephews, but Myers noted Plaintiff's social support network was limited and that Plaintiff had strained relationships with his own children. Id. Myers diagnosed Plaintiff as follows:

| | | |
|---|---|---|
| Axis I: | major depressive disorder recurring moderate-chronic; post-traumatic stress disorder; alcohol abuse | |
| Axis II: | deferred | |
| Axis III: | other medical condition | |

| Axis IV: | problems with primary support; occupational problems; economic/housing problems |
|---|---|
| Axis V: | GAF 34 |

Id. Myers recommended group therapy and counseling as well as a brief psychiatric assessment. Id. A treatment plan was recorded on February 21, 2011, which also listed Plaintiff's GAF score as 34. (ECF No. 11, pp. 380-83).

Dr. Mary Sonntag, Psy.D., conducted a consultative mental exam of Plaintiff on March 22, 2011. (ECF No. 11, pp. 405-09). Plaintiff was taking Zoloft and Trilafon at the time of the exam. Id. Plaintiff reported he lived with his mother and stated he did not need assistance with his activities of daily living. Id. He reported he could drive unfamiliar places, shop independently, but that he could not handle his finances. Id. During the evaluation, Plaintiff had no problems communicating and interacting in a socially adequate manner, spoke intelligibly and effectively, had no difficulty with the typical mental and cognitive demands of basic work-like tasks, could attend and sustain his concentration, persist on the tasks, and completed work-like tasks within an acceptable timeframe. Id. Plaintiff stated he quit his previous job at a convenience store because it made him drink more. Id. Plaintiff's attitude was good and he was cooperative, his speech and affect were normal, his thought processes were logical and relevant, his associations were connected and goal directed, and his thought processes were not circumstantial or tangential. Id. Dr. Sonntag diagnosed Plaintiff as follows:

| Axis I: | major depression, recurrent, severe; alcohol dependence, sustained partial remission |
|---|---|
| Axis II: | no diagnosis |
| Axis V: | GAF 50 |

Id.

On October 4, 2011, Plaintiff was transferred from Siloam Springs Memorial Hospital to Northwest Medical Center in Bentonville to receive a higher standard of care after Plaintiff

complained of chest pain and abnormal stress test results. (ECF No. 11, pp. 414-41, 449, 454). The record indicates Plaintiff was at Siloam Springs Memorial Hospital for alcohol intoxication and a suicide attempt. Id. Testing revealed right axis deviation, a left bundle branch block, and nonspecific ST-T segment abnormalities. Id. Plaintiff was treated with medications and was transferred to Vista Hospital for mental health treatment. Id.

Plaintiff reported to Washington Regional Medical Center, which transferred Plaintiff to Northwest Medical Center in Springdale on November 1, 2011, where Plaintiff reported that he was discharged approximately four days prior from Vista Hospital but he felt he was discharged too early and began to drink which caused suicidal ideations. (ECF No. 11, pp. 932-37). Plaintiff was admitted and his treatment plan included social work, group therapy, milieu therapy, one-to-one meetings with physicians, and treatment with medications. Id. The record indicated Plaintiff tolerated his medications well without side effects and that his symptoms continually improved throughout his stay. Id. Plaintiff reportedly did not have any alcohol withdrawal symptoms during his stay, but did have a gout flare up. Id. The record indicated Plaintiff found housing options with the Salvation Army and planned to go there upon discharge. Id. An objective physical examination during his stay showed normal movement in Plaintiff's extremities and 4+ strength at all locations, 1+ reflexes at patellar tendons, and 2+ reflexes at biceps tendons. Id. He was discharged on November 8, 2011, with instructions to follow up with Ozark Guidance and a primary care physician regarding his blood pressure medications. Id.

Plaintiff presented to Mercy Hospital Northwest on July 19, 2012, and complained of chest pain and toe pain. (ECF No. 11, pp. 850-86). A chest x-ray showed diminished inspiratory effort and some increasing opacity in the left base. Id. An x-ray of Plaintiff's right great toe

showed a displaced obliquely oriented fracture in the terminal tuft, although the clinical impression was no evidence of a fracture, and the imaging also revealed degenerative disease about the first metatarsal-phalangeal joint. Id. Plaintiff was diagnosed with chest pain, coronary artery disease, toe fracture, hypertension, and alcohol intoxication. Id. He was treated with medication, prescribed Hydrocodone-Acetaminophen, and released the same day. Id.

On July 21, 2012, Plaintiff presented to Northwest Medical Center in Springdale and complained of chest pain, suicidal ideation, and alcohol abuse. (ECF No. 11, pp. 907-31). A chest x-ray showed mild cardiomegaly and further testing revealed a stress echo and uncontrolled hypertension. Id. Plaintiff was placed on alcohol withdrawal protocol and stated that having activities during the day to keep him busy helped prevent him from using alcohol. Id. He further admitted he had been off all medications, including medications for hypertension, for approximately the past year. Id. Plaintiff underwent left heart catheterization, a saphenous vein graft injection, and an internal mammary injection. Id. A lexiscan cardiolite stress test was positive for myocardial ischemia. Id. Plaintiff's renal ultrasound was normal. Id. An x-ray of Plaintiff's right toes showed a fractured tuft on his right foot. Id. Plaintiff exhibited a normal range of motion of all his extremities and no motor or sensory deficits. Id. Plaintiff was transferred to the behavioral healthcare unit after he was medically cleared. Id. The record indicates Plaintiff was cooperative and friendly, that the rate, tone, and volume of his speech was normal, his thought processes were linear and relevant, and his insight was good. Id. The record further indicates Plaintiff's relationship with his mother deteriorated and was a major precipitant of Plaintiff's episode, but that his mood improved and he reconciled with his mother before being discharged. Id. Plaintiff was diagnosed as follows:

Axis I:        major depressive disorder, recurrent, severe; alcohol
               dependence

11

| | |
|---|---|
| Axis II: | deferred |
| Axis III: | coronary artery disease; history of coronary artery bypass; hypertension; gout |
| Axis IV: | primary support; financial; occupational |
| Axis V: | GAF 40 |

Id. Plaintiff was discharged on July 28, 2012, whereby he was instructed to maintain a regular diet and follow up with Alcoholics Anonymous ("AA") and Ozark Guidance, and was prescribed Aspirin, Citalopram, Indocin, Prilosec, Coreg, and Lisinopril. Id.

On October 13, 2012, Plaintiff presented to Northwest Medical Center in Springdale and complained of chest pain which woke him up. (ECF No. 11, pp. 450-53, 906, 938-69). Plaintiff also reported shortness of breath and palpitations. Id. He stated he had major depression, had drank approximately one half liter of vodka, and had suicidal ideation. Id. A transthoracic echocardiography report estimated Plaintiff's ejection fraction at 30% to 35% and showed E/A flow reversal suggestive of diastolic dysfunction. Id. It was determined Plaintiff did not require inpatient psychiatric care. Id. A CT of Plaintiff's chest, abdomen, and pelvis did not show any pulmonary embolism, aortic dissection, or vascular abnormality. Id. A chest x-ray showed mild cardiomegaly but no infiltrates and clear lungs. Id. Plaintiff was diagnosed with non-cardiac chest pain, possibly gastrointestinal, as well as hypertension, alcohol abuse, and depression. Id. He was treated with medications and discharged on October 16, 2012, and no new prescriptions were noted in the record. Id.

Plaintiff's mother took him to Northwest Medical Center in Springdale approximately one month later on November 24, 2012, for hypertension, alcohol dependence/withdrawal, and suicidal ideation. (ECF No. 11, pp. 891-905). Plaintiff was also treated for GERD and gouty arthritis. Id. During this visit, Plaintiff reported he began working part time at a campground in Monte Ne, Arkansas where he lived in a motor home, and that he liked to fish and fly model

airplanes. Id. Plaintiff was referred to the psychiatry department on November 25, 2012, for inpatient treatment services. Id. During his visit, the record indicates that Plaintiff's mood continually improved but that he did become involved in an altercation with a peer which delayed his treatment progress. Id. Plaintiff also reported feeling unsafe on December 3, 2012, but was discharged on December 4, 2012 after having been free of suicidal ideation for 24 hours. Id. On discharge, Plaintiff was diagnosed as follows:

| | |
|---|---|
| Axis I: | major depressive disorder, severe without psychotic features; alcohol dependence |
| Axis II: | deferred |
| Axis III: | hypertension; osteoarthritis; coronary artery disease, status post coronary artery bypass grafting; GERD; gouty arthritis; chronic pain secondary to thermal burns, status post skin grafting |
| Axis IV: | primary relationship; social support; financial |
| Axis V: | Admission GAF 25; Discharge GAF 40 |

Id.

On February 27, 2013, Plaintiff returned to the Community Clinic at St. Francis House to re-establish routine care with Karen Pinkerton, a nurse practitioner, and Kelly Gray, a licensed clinical social worker. (ECF No. 11, pp. 972-81). Plaintiff reported the following during his intake review: he had suffered from depression since 1993; he disliked taking medications and often did not take them; he had been walking and exercising but that he had to force himself to do it, and that he was used to weightlifting and kick-boxing; that he enjoyed fishing and camping but that he did not consider either activity to be strenuous; that he regularly visited with his family and some friends he has had since school, but that he became irritated when he could not spend time with anyone except his mother because others are working and unavailable; and that he had a good support network but that he often isolated himself during periods of depression. Id. A physical examination revealed Plaintiff had decreased sensation in both his right and left upper extremities, and was unable to complete the finger to thumb test

because of scarring. Id. Plaintiff was able to complete the finger to nose test without difficulty and his grips were normal and symmetrical. Id. Plaintiff was diagnosed with depressive disorder NEC and R/O bipolar disorder or dysthymia. Id. Plaintiff's treatment plan included techniques to decrease his symptoms of depression, that he complied with taking his medications, that he avoided social isolation, and that he avoided alcohol. Id. The record does not indicate whether Plaintiff's treatment included any new prescriptions.

On April 25, 2013, Plaintiff was taken to Mercy Hospital Northwest from jail, after being arrested for allegedly operating a motor vehicle while under the influence of alcohol. (ECF No. 11, pp. 997-1156). Plaintiff complained of chest pain and was admitted to the hospital for delirium tremens and pneumonia. Id. He reported he had been drinking heavily for several days and that he previously drank approximately one liter of vodka per day before becoming sober approximately one year prior. Id. Plaintiff was treated primarily for delirium tremens which resolved his chest pain. Id. A chest x-ray showed stable cardiomegaly, post-surgical changes of median sternotomy, and no acute intrathoracic processes. Id. A physical examination was conducted to determine whether Plaintiff would benefit from physical therapy. Id. Plaintiff's right and left upper extremity range of motion were both within functional limits. Id. His upper extremity gross strength was rated 4/5 on both the right and left. Id. His lower extremity range of motion was within functional limits. His lower extremity gross strength was rated 4/5 on both the right and left. Id. Plaintiff's healthcare providers determined physical therapy was unnecessary to meet the goals of his care plan. Id. Plaintiff was diagnosed with chest pain, pneumonia, hypertension, acidosis, alcohol abuse, coronary artery disease, delirium tremens, a history of coronary artery bypass grafting, hyperlipidemia, and metabolic acidosis and was discharged on April 28, 2013. Id.

Dr. Jonathan Norcross, a non-examining state agency consultant, examined Plaintiff's records on April 29, 2013, in relation to Plaintiff's initial applications for benefits and determined Plaintiff retained the physical RFC for light work with no additional limitations. (ECF No. 11, pp. 92-93, 107-08).

On April 30, 2013, Plaintiff visited with Kelly Gray, a licensed clinical social worker at the Community Clinic at St. Francis House, and stated he had become depressed and was drinking again. (ECF No. 11, pp. 1159-62). Gray diagnosed Plaintiff with depressive disorder and R/O bipolar disorder or dysthymia, and alcohol abuse and assigned Plaintiff a GAF score of 49 on this visit. Id. Gray directed Plaintiff to avoid isolation, increase his physical activity level, engage in enjoyable activities, and to follow a safety plan if he engaged in suicidal ideation. Id. She also directed him to seek help through AA and to go to the emergency room if he experienced alcohol withdrawal symptoms. Id. Plaintiff also met with Karen Pinkerton, a nurse practitioner, who diagnosed Plaintiff with alcohol abuse, hypertension, coronary atherosclerosis, hyperlipidemia, major depression, and severe recurrent major depression with psychotic features. Id. Plaintiff was instructed to continue taking his current medications but the record does not indicate any new prescriptions were given. Id.

Dr. Kay Cogbill, a non-examining state agency consultant, examined Plaintiff's records on May 1, 2013, in relation to Plaintiff's initial applications for benefits and determined Plaintiff retained the mental RFC for unskilled work. (ECF No. 11, pp. 93-95, 108-10).

Dr. Ronald Davis, a non-examining state agency consultant, examined Plaintiff's records on July 22, 2013, and July 24, 2013, in relation to the reconsideration of Plaintiff's applications for benefits and determined Plaintiff retained the physical RFC for light work with no additional limitations. (ECF No. 11, pp. 125-26, 142-43).

Dr. Dan Donahue, Ph.D., a non-examining state agency consultant, examined Plaintiff's records on July 23, 2013, in relation to the reconsideration of Plaintiff's applications for benefits and determined Plaintiff retained the mental RFC for unskilled work. (ECF No. 11, pp. 126-29, 143-45).

## III.   Applicable Law:

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. Teague v. Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. Id.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

16

clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(3)(c). A Plaintiff must show

that his disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation

process to each claim for disability benefits: (1) whether the claimant has engaged in

substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical

and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet

or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from

doing past relevant work; and, (5) whether the claimant is able to perform other work in the

national economy given his age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's

age, education, and work experience in light of his residual functional capacity. see McCoy v.

Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v.

Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## IV.    Discussion:

Plaintiff argues in this appeal that: 1) the ALJ failed to fully and fairly develop the

record, and 2) the ALJ failed to apply the limitations of each of Plaintiff's impairments to the

requirements of the tasks related to jobs that the ALJ listed as potential work for Plaintiff. (ECF

No. 9).

### A.    Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective

complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily

activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and

aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5)

functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 946, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The ALJ considered Plaintiff's activities of daily living and noted Plaintiff cared for his personal needs, prepared meals, drove a vehicle, shopped, paid bills, counted change, managed a bank account, used a checkbook, fished, watched television, and spent time with others. (ECF No. 11, pp. 22). The evidence in the record also shows Plaintiff consistently refused to comply with taking his prescribed medications and refused to follow the advice and counsel of his healthcare providers regarding his use of alcohol. "[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original); see also Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) ("[A] failure to follow prescribed medical treatment without good cause is a basis for denying benefits."). Moreover, the record indicates Plaintiff's symptoms were adequately controlled by medication when he properly took his medication or received treatment from a hospital. Most of the evidence in the record where Plaintiff complained at a hospital of chest pain and depression indicates Plaintiff was intoxicated and also suffering alcohol withdrawal symptoms. Although Plaintiff's symptoms often required extensive and

sometimes invasive testing, his treatment was typically conservative, and consisted largely of managing his symptoms with medication and counseling. Plaintiff's reported activities of daily living, refusal to follow treatment advice, and continued use of alcohol against medical advice are inconsistent with his allegations of disabling pain.

Finally, Plaintiff never sought treatment for any alleged limitation based on his burns and skin grafts during the relevant period. See Forte v. Barnhart, 377 F.3d 892, 895 (8ᵗʰ Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider); See also Moad v. Massanari, 260 F.3d 887, 892 (8th Cir. 2001) (in assessing credibility, the court noted that plaintiff had not sought treatment from any physician in the seven months prior to administrative hearing). Aside from Plaintiff's testimony at the administrative hearing, the record does indicate that, in one instance on February 27, 2013, Plaintiff was unable to complete a finger to thumb test due to the scarring on his hands. (ECF No. 11, pp. 972-81). The same record indicates, however, that Plaintiff's grips were normal and symmetrical, and further testing on April 25, 2013, indicated Plaintiff's right and left extremity range of motion were both within functional limits, and that Plaintiff had only mild limitation to his right and left upper extremity gross strength. (ECF No. 11, pp. 972-81, 997-1156). Moreover, although Plaintiff alleged at the administrative hearing he was unable to perform his past relevant work due to his scarring and skin grafts, the past relevant work the ALJ determined Plaintiff could return to, namely that of a cashier II and a car wash attendant, was work performed by Plaintiff after he acquired his scarring and skin grafts. The record does not indicate that Plaintiff's alleged limitations due to his scarring and skin grafts worsened after ceasing his past relevant work. In fact, during his consultative mental examination with Dr. Sonntag on March 22, 2011, Plaintiff stated he quit his previous job at a convenience store because it made him drink more,

not because his alleged limitations due to his scarring and skin grafts prevented him from performing his job duties. (ECF No. 11, pp. 405-09).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**B.      ALJ's RFC Determination and Medical Opinions:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

The ALJ considered all of Plaintiff's physical impairments, those he determined to be severe and non-severe, in determining Plaintiff's RFC. Plaintiff filed his applications for DIB and SSI on February 20, 2013, alleging disability beginning January 15, 2008, due to heart

problems, high blood pressure, bipolar disorder, and shoulder problems (ECF No. 11 pp. 250). As more thoroughly discussed above, in reference to Plaintiff's credibility, Plaintiff never sought treatment for any alleged limitation based on his burns and skin grafts during the relevant period. Nearly all of the evidence in the record detailing Plaintiff's healthcare history shows that Plaintiff frequently sought medical attention for his chronic ischemic heart disease and his mood disorder, impairments which the ALJ determined were severe, along with obesity. (ECF No. 11, p. 18). As noted above, aside from Plaintiff's testimony at the administrative hearing, the record does indicate that, in one instance on February 27, 2013, Plaintiff was unable to complete a finger to thumb test due to the scarring on his hands. (ECF No. 11, pp. 972-81). The same record indicates, however, that Plaintiff's grips were normal and symmetrical, and further testing on April 25, 2013, indicated Plaintiff's right and left extremity range of motion were both within functional limits, and that Plaintiff had only mild limitation to his right and left upper extremity gross strength. (ECF No. 11, pp. 972-81, 997-1156). The ALJ determined Plaintiff did have some limitation and his RFC limited Plaintiff to frequent, rather than constant, handling and fingering bilaterally and frequent, rather than constant, reaching, including overhead. Accordingly, this Court finds the ALJ's RFC assessment with regard to Plaintiff's physical limitations is supported by substantial evidence on the record as a whole.

The ALJ considered Plaintiff's mental health history and determined Plaintiff's affective disorder was a severe impairment. (ECF No. 11, pp. 18). Plaintiff specifically alleges the ALJ improperly disregarded Plaintiff's GAF scores. The GAF is a numerical assessment between zero and one hundred that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. Kluesner v. Astrue, 607 F.3d

21

533, 535 (8th Cir. 2010). Notably, a GAF score is not essential to the residual functional capacity assessment. See Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score is not essential to residual functional capacity accuracy). "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment, measuring its impact, and predicting outcome." See DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 32 (4th ed. 2000). The GAF scale is to be rated with respect only to psychological, social, and occupational functioning. Id. The instructions specify that impairment in functioning due to physical or environmental limitations is not to be included. Id.

The ALJ identified Plaintiff's GAF scores ranged from 20 to 50, and stated, "[w]hile some weight was given to these scores, the [ALJ] must rely on evidence that demonstrates the claimant's overall ability to function." (ECF No. 11, pp. 25-26). Under the social security regulations, the Commissioner will generally give a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) . . . controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2)3; see also Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). Yet such weight is neither inherent, see Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006), nor automatic and does not "obviate the need to evaluate the record as whole," Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). The Commissioner "'may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012)

22

(quoting <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010)); <u>accord Hacker</u>, 459 F.3d at 937 (noting we have declined "to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her . . . assessment").

In the present case, the mental RFC assessed by the ALJ, which limited Plaintiff to unskilled work, was consistent with the evidence available on the record. During Plaintiff's follow up visit with Northwest Arkansas Heart and Vascular on February 11, 2010, it was noted during Plaintiff's objective medical examination that his attention, concentration, and mood and affect were all normal. (ECF No. 11, pp. 466-69). As discussed above, on January 22, 2011, Plaintiff was described as:

> not angry, not blunt, not labile and not inappropriate. His speech is not delayed, not tangential and not slurred. He is slowed. He is not agitated, not aggressive, is not hyperactive, not withdrawn, not actively hallucinating and not combative. Thought content is not paranoid and not delusional. Cognition and memory are not impaired. He does not express impulsivity or inappropriate judgment. He exhibits a depressed mood. . . . He is communicative. He exhibits normal recent memory and normal remote memory. He is attentive.

(ECF No. 11, p. 819). Upon his discharge from Springwoods Behavioral Health on February 7, 2011, the provider noted Plaintiff's prognosis was good but that it was dependent on Plaintiff's compliance with medications, discharge planning, and abstinence from mood-altering substances such as alcohol. (ECF No. 11, pp. 391-403). During Plaintiff's consultative mental exam with Dr. Sonntag on March 22, 2011, Plaintiff had no difficulty communicating and interacting in a socially adequate manner, spoke intelligibly and effectively, had no difficulty with the typical mental and cognitive demands of work-like tasks, could attend and sustain his concentration, persist on tasks, and completed work-like tasks within an acceptable timeframe. (ECF No. 11, pp. 405-409). Moreover, his attitude was good, he was cooperative, his speech and affect were normal, his thought processes were logical and relevant, his

associations were connected and goal directed, and his thought processes were not circumstantial or tangential. Id. Upon discharge on July 28, 2012, after Plaintiff presented to Northwest Medical Center in Springdale and complained of chest pain, suicidal ideation, and alcohol abuse, Plaintiff was cooperative and friendly, the rate, tone and volume of his speech were normal, his thought processes were linear and relevant, and his insight was good. (ECF No. 11, pp. 907-31). Accordingly, this Court finds the ALJ's RFC assessment with regard to Plaintiff's mental limitations is supported by substantial evidence on the record as a whole.

The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of many treating physicians, surgeons, and specialists, as well as those of the non-examining state agency consultants, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination for the relevant time period.

**C.      Hypothetical Question to the Vocational Expert:**

Plaintiff specifically contends that the ALJ erred by not including all of Plaintiff's impairments, limitations, and restrictions in the hypothetical questions posed to the VE. (ECF No. 9). The ALJ's first hypothetical posed to the VE was substantially the same as the ALJ's RFC determination:

> assume an individual with the same age, education, and work experience as that of the claimant who is able to lift and/or carry 20 pounds occasionally; lift and/or carry 10 pounds frequently; stand and/or walk six hours out of an eight-hour workday with normal breaks; push and pull with limitations pursuant to

> the lift/carry limitations; and handle on a bilateral basis frequently; able to finger on a bilateral basis frequently; reach including overhead reach on the right would be frequent; able to perform work where interpersonal contact is incidental to the work performed; complexity of tasks is learned and performed by [rote] with variables and little judgment; supervision required is simple, direct, and concrete.

(ECF No. 11. p. 74). Plaintiff's argument with regard to the hypothetical question posed to the VE is essentially a disagreement with the ALJ's RFC determination. After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing the duties of a cashier II or car wash attendant. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### D.     Failure to Properly Develop the Record:

Plaintiff argues the ALJ failed to develop the record, specifically with regard to limitations imposed by Plaintiff's scarring and skin grafts as well as with regard to the Plaintiff's GAF scores. (ECF No. 9).

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995); Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000). This is particularly true when Plaintiff is not represented by counsel. Payton v. Shalala, 25 FG.3d 684, 686 (8th Cir. 1994). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case.

Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). However, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) ("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial"). "The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment. They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 1989). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Mans v. Colvin, No. 13-CV-2103, 2014 WL 3689797 at *4 (W.D. Ark., July 24, 2014) (quoting Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994).

Plaintiff's argument, that the ALJ failed to fully and fairly develop the record, is without merit. Plaintiff only put forward hearing testimony to support his alleged limitation based on his burns and skin grafts. As discussed more thoroughly above, substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible. Moreover, Plaintiff does not allege any lack of development of the record in this regard was unfair or prejudicial, except that the ALJ's final decision was unfavorable, nor does Plaintiff seek any specific relief that the ALJ be required to contact a particular healthcare provider for further evaluation, or that he order a consultative examination. Plaintiff's argument with regard to full and fair development of the record with regard to his GAF scores is effectively an argument regarding the ALJ's RFC assessment, which is more thoroughly discussed above. Here, as well, Plaintiff does not allege any lack of development of the record in this regard was unfair or prejudicial, except that the ALJ's final decision was unfavorable, nor does Plaintiff

seek any specific relief that the ALJ be required to contact a particular healthcare provider for further information or to diagnose a new GAF score. As more fully set forth above, the record already contains multiple GAF scores the ALJ considered in his decision.

The ALJ had before him the evaluations of numerous healthcare providers spanning approximately seven years of Plaintiff's healthcare history, which, as more specifically set forth above, provided sufficient evidence for the ALJ to make an informed decision regarding Plaintiff's alleged physical and mental impairments. The Court also believes that other evidence in the record, including Plaintiff's own statements, constituted evidence regarding Plaintiff's physical and mental limitations, and that the existing medical sources contained sufficient evidence for the ALJ to make a determination regarding Plaintiff's alleged impairments. The Court therefore finds Plaintiff's argument on this issue is without merit.

## IV.    Conclusion:

Accordingly, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of October, 2016.


/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE